The last case on our argument calendar this morning is the Cetacean Community v. George W. Bush at Allen. I think the heart of this case is actually found in the history of this case, when you look at the history of low-frequency active sonar and the government's approach to it. What happened is the government made a proposal to develop low-frequency active sonar as a technology for detecting silent submarines and responding to potential hostilities before those submarines were within range of a U.S. ship and could do some damage. That was the only proposal ever on the table. For some reason, the government chose to bifurcate that proposal into a proposal to develop and deploy the technology for routine training and operation and a proposal to develop and deploy the technology for threat and warfare conditions. So they only did their NEPA analysis, their environmental impact statement, for routine training and exercises, military exercises. They only did their Marine Mammal Protection Act compliance for permits for routine training and military exercises. And they only did their endangered species analysis for the same contingency. If the court finds that there was only one proposal, a proposal to develop the technology for response and threat and warfare conditions, then from the beginning, there's a problem. They should have done an EIS for the whole proposal. If they'd done an EIS for the whole proposal, they would have done the rest of the process for the whole proposal. The fact that they did all of that process for the routine operation is basically an admission that they should have done it for all of the operation. OK. Now, we've got a problem from the beginning, and that's standing. Standing. Absolutely. Could you please address that? I certainly will. In one sense, the standing issue, I think, is simple. By not being there in San Francisco, are any of the parties present in court? Their representative is present in court. They are not. Just as the palila bird could not actually wing its way into court to have standing because it lives on Mauna Kea on our beautiful island of Hawaii, the whales, dolphins, and porpoises could not swim their way into court to be before you today. And they're not participating by telephone? Not by telephone. We have this wonderful technology going on that Judge Hug is able to be here, and perhaps someday we'll have technology where they can be here as well. OK. Thank you. I think that in one sense it's very simple. The palila court, if you look at all four palila cases, starting with the first one and ending with the fourth one, that had the opinion about standing of the palila, the focus of the court was on the Endangered Species Act and how stringent the act was, how broad it was, how compelling its purpose was, and the compelling purpose was to prevent extinctions. That the palila bird was acknowledged to have legal status, the palila bird was acknowledged to have standing. They specifically stated it had standing. They capitalized it in the caption of the case to acknowledge that they granted it standing and that it appeared in the case with legal representation. And it shows up there, and it's not just buried in a footnote. It's there in the beginning paragraph of the opinion winging its way into this case in Judge O'Scanlan's opinion. I understand that. It's right there in the case, yes. Were there other two-legged, non-winged plaintiffs in the palila case? No, palila was the only non-human plaintiff in the case. Are you sure that's right? The suit sought to remove goats and sheep from the mountain. I'm talking about plaintiffs. I don't think the bird was the only plaintiff in that case. Oh, I'm sorry. There were human plaintiffs and the bird, yes. Yeah, yeah. So even if the bird had not had standing in the palila case, there were plaintiffs in that case. There were plaintiffs who would have had standing. And even if the humans had not had standing, we would argue the palila would have had standing. But it goes both ways. Right. But in terms of whether or not the palila standing was essential to that suit being allowed, there were people also on the plaintiff's side. There were people who had standing, yes. And the defendants have argued that this decision in palila is simply dicta. They didn't have to reach the issue because there were people who had standing. We are arguing that there's a judicial principle at stake here, and that is that the court can at any time reach out and determine whether the party's in front of the court has standing, and that that's exactly what the palila court did. What happens if next week we get a suit filed on behalf of the whales by the United States Navy? The Navy filing suit on behalf of the whales? That's right. They're litigating, and they say, My client's the whale. And how am I to know otherwise? I mean, I have private conversations with the whale, and I'm here as the United States Navy. I'm their lawyer. And you know what? This stuff is really good. My client has agreed to a settlement. I think what we have to look at is the status of the plaintiffs as endangered species. Number one, if they are endangered species, and number two, if the suit does bring a valid allegation of harm to an endangered species, that's what the palila court was really addressing, that there should not be a situation where an endangered species cannot get judicial protection simply because there's no human surrogate to step in and qualify under the nexus doctrine and all the other doctrines that a human surrogate has to meet, that it would make no sense to allow a species to go extinct because there was no human surrogate available for whatever reason to file a suit. Is there a showing here that there is no human surrogate available to file a suit? Well, the extent of the showing is that the human surrogates who filed suit  specifically left out the issue of the failure to perform any environmental analysis, seek any permits or do any consultation on threat and warfare conditions. But that sounds like either, depending on how one views it, a litigation mistake or a litigation decision with which one might have a quarrel. It doesn't sound as though they're not there trying to represent them. I think it was a litigation strategy adopted by the human surrogates that was not in necessarily the best interest long-term of the plaintiffs here today. So they have come on their own today, if you will, to raise issues that were not raised in the other suit. Now, I raise the point in a facetious sort of way, but I actually have a very genuine problem with it, which is, of course, common to our standing analysis, and that is if the main plaintiffs are the whales and the dolphins and the endangered species, or maybe would-be endangered species, and I can't undertake an inquiry as to how loyal the lawyer is to the interests of those clients, which is not the way you ordinarily do. I don't sit in on the conversations between the clients and the lawyers. If the client doesn't like the lawyer, the client fires the lawyer. We don't interfere with that. Right. What guardians do your clients have if, I don't know, just to name somebody, the Pacific Legal Foundation decides to represent the whales? I don't think you'd like the Pacific Legal Foundation representing the whales. Or the United States Navy. I mean, you can choose an organization with which you had some adversarial relationship, and all of a sudden they're representing the whales. I understand, and I think in one sense it emerges from the nature of the case. If they are arguing actual damage to an endangered species and seeking to protect the endangered species, that should be clear. If the lawyer is coming in to argue for allowing things that would be harmful to the endangered species and volunteering the endangered species to experience that harm, I think the court can look at that as at least disingenuous and take some supervisory role. We did not specifically argue for something like a guardian ad litem because we didn't like the implications of that or the consciousness argument that we have also made. However, there is, I think, a supervisory role for the judiciary. If someone has shown up to represent a client and is inadequately representing the client's interest, and that's obvious to the court because they're arguing for harm rather than benefit, I think the court can intervene and stop what's happening. Can we make the same argument for the trees and some of the forest litigation? Well, I think there you're touching on what Justice Douglas raised way back when, when he said a river ought to be able to come into court and file suit on behalf of all the interests supported by the river. I think it makes a lot of sense to allow that. This case doesn't go that far because it specifically is pegged on the Endangered Species Act. And there what you have in the Endangered Species Act is the ultimate risk of extinction. So you have a very compelling interest in not allowing a species to go extinct without at least having a shot at coming before the court to get protection that's warranted by existing law. So I think if the court's decision is limited to endangered species having standing, it may well set the groundwork for a later reevaluation of something like whether a river should have standing or a mountain should have standing or trees should have standing. But it doesn't necessarily reach that point yet. I do think it does open that door and that that's a good thing, that the more we look at the human relationship to the natural environment and make it more of a balanced relationship, the better off we are. The fact that there are 60,000 extinctions a year happening right now and that we're not winning the battle on extinctions, we're losing the battle, means that whatever we can do to improve the chances of species surviving that may hold great value for us, even if we are not saying that they are in and of themselves valuable, that may hold great value for humans, anything we can do to prevent that, I think we should be doing, not outside necessarily the judicial context of a case, but in this case I think it fits within the judicial context. We argue that palela is a precedent, that it should have been acknowledged as a precedent, and the failure of the district court to acknowledge it as a precedent is simply an error, and that if that is acknowledged as a precedent and reaffirmed by this court, which is what we hope will happen, that you then move to a case where the federal government has basically thumbed its nose at the law,  have all said, yes, this is a proposal to develop a technology for use during threat and warfare conditions, and we're not going to do an EIS for those conditions, and we're not going to seek permits for those conditions, and we're not going to do an Endangered Species Act consultation for those conditions, and that's the way it's going to be. The regulatory agency has determined that it's not going to apply the law of the Marine Mammal Protection Act and the Endangered Species Act to use during threat and warfare. Well, there's nothing, absolutely nothing in the National Environmental Policy Act that says just because what you're proposing to do may be used in threat and warfare, you don't have to do an environmental impact statement. What if an attorney that is really not qualified to argue for endangered species for maybe his own purpose files a claim on behalf of an endangered species, a frog or some other animal, and does a really poor job, but it becomes race to Dakota? Well, that would be very unfortunate, obviously, if that were the case. Isn't that a danger in the situation that you're arguing for? Well, I think it's very rare that the court actually sees the clients. They see the attorneys who represent the clients, and you have that risk in every suit, I think, that the attorney representing the client will do an inadequate job, will get a decision that's harmful to his client's interest and his race to Dakota for other people in the system who might be coming forward with a similar claim. I guess the endangered species run the same risk as any client who hires a lawyer. Yeah, but the endangered species have no say in who represents them. The client does. The problem with it is if you have a situation where there's no human surrogate and the endangered species can't get a representative, then what you're saying is the alternative is risk having some incompetent lawyer come in and represent them and get a terrible decision or go extinct. I think we can assume that an endangered species would prefer an incompetent lawyer to extinction and that those are the kind of determinations that the court can make when those cases come before it. So is that a key issue here as to whether any of these fish could get someone who would represent them that would be adequate? Or is that something we should consider, whether there's anything for whales or porpoises? I'm not quite sure I understand your question. Well, it seems like there are an awful lot of organizations that seek to protect whales and porpoises, for example. How do we look at this? Do we look at it from the standpoint that they were unable to get adequate representation and therefore they sue themselves? I think you look at – there's really two questions I hear there. One is what will be the result of such a decision. I think the result of such a decision won't be a great number of cases filed only in the name of the species, that there will be organizations filing cases on behalf of endangered species. That the situation we are trying to prevent is a situation where an endangered species doesn't have an adequate nexus to an organization that would be willing to file suit for resource reasons or whatever to bring the case before the court. And that we're filling a gap, essentially, in the Endangered Species Act that the Palila Court, I think, intended to fill. That the Palila bird should be given standing because it was endangered and the law said you've got to prevent extinctions. Is that what that brief paragraph said? I didn't get that out of that paragraph. No, I get it out of reading all four cases together, the four Palila cases. There's extensive discussion about the compelling purpose of the Endangered Species Act, the stringent nature of it, that you can't destroy any critical habitat, it's one of the strongest laws Congress ever wrote. You read all of that as the context and then you reach them saying, and the Palila bird as an endangered species should have standing, I think that informs that final conclusion that's reached in the fourth case. On the ripeness issue as well, I think that the federal government is being disingenuous to say the case is not ripe. Not only was the only proposal to develop a technology for use during threatened warfare, and that's the proposal that should have been subject to an EIS, they now say there are no plans to use the technology in threatened warfare. And we have discussed that in the judicial estoppel argument. And I think this is a case totally appropriate for judicial estoppel if you have to reach that question. And I would argue you don't have to reach that question. You can just look at the proposal and say they should have done an EIS and it's over. Are you going to argue the failure to file the notice of intent to sue? I see your time is running short. My time is running short. On the failure to file notice, there's... There was no notice filed. There was no formal notice filed to the secretary that they hadn't prepared an EIS and hadn't done their consultation. They were, however, certainly on notice of the fact that they had not done so in two respects. One was the earlier litigation over the irreversible and irretrievable commitment of resources to this technology without a compliance with environmental law, and the court ruled that they hadn't made a decision to deploy it yet, so it wasn't ripe. What do we do with this circuit's statement in Southwest Center? A failure to strictly comply with the notice requirements acts as an absolute bar to bringing suit under the ESA. Our argument there is that the government has deliberately and systematically refused to comply with the law, that the enforcement agency was on notice of that refusal and has determined that it is not going to apply the law to that refusal, and that, therefore, there's simply nothing more that can be done. The agency responsible for consulting refuses to consult. The agency responsible for enforcing the law refuses to enforce it. That filing a notice, we could file notice till kingdom come, and they've already made all the determinations that will ever be made. So you're saying that excuses your failure to strictly comply with the law. We are saying that it meets the test of filing notice when potential litigation is possible. I'd point out, too, that in this instance, when we filed the comment on the proposed rule, that there was no EIS, that there was no MMPA permits, that there were no ESA consultation. When we filed that comment on the proposed rule, we had already filed four lawsuits over the Low Frequency Active Sonar by that point. They were well on notice that we were looking at that very carefully and that there was litigation possible. And even in the context of knowing litigation was possible, having noticed that the compliance with the law was not taking place, the regulatory agency made a determination that they were not going to require compliance with the law, that they were going to allow operations during threat and warfare with no permits, no ESA consultation, no EIS, and that's just the way it was going to be. When there's a systematic plan in place, when there's an announced government policy in place, I think taking the mechanistic approach finally reaches its limit. I think there has to be a limit to when the mechanistic approach is required. Shouldn't that argument be addressed to Congress, and that does? I think this Court has the capacity to address that argument in the sense that if every prerequisite of what the law was intended to achieve is achieved, if everything that could have been done has been done to correct the error and the agency that would have corrected it has made it a policy not to correct it, that requiring someone to then go back, file a notice, and start all over again simply makes no sense and is a futile gesture, and that this Court can find that that futility is not required. I would like to reserve my remaining time for rebuttal, if I might. Okay. Fine. Thank you. Thank you for your argument. A chair from the government. Good morning. May it please the Court. I'm Katie Kovacs on behalf of the United States. The only question the Court needs to answer in this case is whether animals can have standing under the Administrative Procedure Act or the Endangered Species Act. The answer to the question is very simple. The Court is bound by the plain language of the statutes. Animals are not persons. They cannot have standing under these statutes. Aren't we bound by the law of our circuit as well? You are bound by the law of your circuit, but the Palila decision is not binding. Judge O'Scanlan, in the opening paragraph of the Palila decision, made a remark about a bird being able to wing his way into federal court. As Judge Fletcher recognized, there were human plaintiffs in that case. In a case where you have a plaintiff who has standing, there's no need for the Court to examine the standing of the other plaintiffs. And as is true in all of the cases in which animals are named as plaintiffs, there were human plaintiffs too. In the Palila case, no one raised standing. It was never briefed. The Court didn't discuss it. The Court simply made an off-the-cuff remark in the opening paragraph. Let me read to you this off-the-cuff remark. And Judge Alicorn's comment is something I've... This is real to us, I'm afraid. And I'm not just reading from the opinion. As an endangered species, under the Endangered Species Act, the bird, then we get the Latin name, a member of the Hawaiian honeycreeper family also has legal status and wings its way into federal court as a plaintiff in its own right. The Palila, which has earned the right to be capitalized, since it is a part due to this proceeding, is represented by attorneys for. That's not just a casual remark. That's the second paragraph in the opinion before you even get to the sort of the facts and proceedings. I mean, this is not just a throwaway remark in a footnote. As I said, Your Honor, and based on the cases that I've cited in my brief, it is dicta. It was not necessary for the Court to reach standing, and the Court actually, if you notice, provides no discussion of the matter, no citations for the matter, and it is directly contrary to the plain language of the statute. The APA... You want a petition for us to rehear this case on banks so we can overrule a panel decision? I think that's absolutely unnecessary. Palila is simply dicta, and even if it's not dicta, as Judge Alicorn recognized, there was no notice. And the ESA claim can be dismissed on that basis as well. The fact that they had filed lawsuits previously certainly doesn't suffice to give notice. And there is no futility exception to the notice requirement. Giving notice after the government has reached a decision is not futile. It's the way it's normally done. An agency reaches a decision. You provide notice that you're not happy with it and you're going to sue, and then 60 days later, you sue. That's the way it works. The notice provision is an absolute bar to jurisdiction. So even if the court feels bound by that statement in Palila, the ESA claim must be dismissed for failure to provide notice. But the APA claims, the Marine Mammal Protection Act and National Environmental Policy Act claims, come under the APA. No court in this country has ever held that animals have standing under the APA, nor could they, because the plain language of the statute gives the right of action to persons. Persons are human. Animals are not human. Let me ask you this. Is a corporation a person? A corporation is a person. Corporations are within the definition of person in the statute. We've already moved away, then, from the plain language definition of person, so the GM is a person. GM is a person because Congress, in the definition of person in the APA, defined person as an individual partnership corporation. And it makes sense because a corporation is a representation of humans. It is a jural entity. Animals are not jural entities. The law simply does not recognize animals as entities capable of appearing as litigants before the court, nor could it. And getting to the human surrogate question, which the court had some interest in, I think there is ‑‑ it is necessary to have a human surrogate in order to meet the purposes of the standing requirement under Article III. We need to be sure that the litigants appearing before the court have an interest in the outcome of the case so that there is a case or controversy under Article III. Here there is a human surrogate. There is another case, Natural Resources Defense Council and a number of other plaintiffs versus Evans, in which NRDC and the other plaintiffs submitted a pile of affidavits attesting to the interests of their members around the world on the use of the sonar. And the government didn't contest their standing in that case. And I just ‑‑ since briefing in this case, that case has reached final judgment and the government has noted an appeal in that case just for the court's information. Of course ‑‑ Is that case final appeal finished here or ‑‑ It's filed. There is a notice of appeal in this court currently. Notice of appeal in this court from the district court? From the district court. The government filed a notice of appeal opening brief, sir. That's the case in Judge LaPorte's court? I'm sorry? Is that the case in Judge LaPorte's court? Yes. Correct, Your Honor. And it's worth noting, I think, NRDC and the other plaintiffs did leave out any challenge to the use of the sonar in combat. They didn't challenge how the government had ‑‑ how the Navy had defined the scope of its proposal. And I think wisely so, because in all likelihood, those claims would be unreviewable. Although, of course, the government has to comply with the law, the use of the sonar in combat, for example, is probably going to be classified information. And under Catholic action, that's not reviewable. There are also national defense exemptions to some of the statutes. There's the time of war exception to the Administrative Procedure Act. In all likelihood, those claims would be unreviewable. And so it made sense for NRDC to leave that out. It's also entirely reasonable for the Navy to carve out the use of the sonar in combat, because when the Navy went through the environmental process, it voluntarily limited its own use of the sonar significantly to reduce the environmental impacts of the sonar. Those sorts of limitations may or may not be feasible in a combat situation. So doing a separate analysis is entirely reasonable. That's all aside from the point of standing, which I think is the only question that the Court really needs to decide in this case. Again, no court has ever held that animals have standing under the Administrative Procedure Act. I would suggest that this Court should not be the first. And the same is true of the Endangered Species Act. No court of appeals in this country has ever held that animals have standing under the Endangered Species Act. I would submit that Pallela is dicta that is not binding on this panel. And even if it is and the Court feels bound by it, the ESA claim was properly dismissed for failure to provide notice. I think I can rest on the briefs on the remaining issues unless the Court has questions. But I did want to mention one other thing, which is that Mr. Sinkin filed a motion for the Court to take judicial notice yesterday of a newspaper article. Unless the Court feels the need for me to file a written opposition, I would like to simply oppose that motion here today because the newspaper article is not in the record of the case and is not admissible evidence for a number of different reasons, not the least of which is that it's irrelevant and hearsay and lacks the foundation and several other reasons. Okay. I think this is accurate for the rest of my colleagues and certainly for me. We've not yet seen that motion for judicial notice. And until you hear from us further, we will take your oral motion here as a motion opposing. Thank you very much, Your Honor. Does the Court have any further questions on the other issues? Thank you very much for your time. Just very quickly in rebuttal, I think that the case law is quite clear that the procedural side of the Endangered Species Act is just as important as the substantive side of the Endangered Species Act, and that to say that you can enforce the substantive side but you can't enforce the procedural side as an endangered species would be both to limit the ability to enforce the law and basically violate the due process rights of the plaintiffs. If you say the plaintiffs have standing under the Endangered Species Act to pursue an ESA claim, then they have standing. They should be able to pursue an APA claim as well that's particularly one that's related to the Endangered Species Act. So when you have the President and the Secretary of Defense refusing to comply with the Endangered Species Act through either undue delay or an illegal withholding of action, and perhaps I should touch on that point very briefly, if we view under the APA it's either illegal withholding act, illegal withholding or undue delay, if you look at that first component, if it's illegal withholding, that may be a substantive violation of the Endangered Species Act. It wouldn't even require APA, but we argue they should have APA standing as well. As far as the NRDC case that the council mentioned, that case did specifically go after low-frequency active sonar and did specifically not raise the issues raised in this case. And we say that validates the need to allow this case to go forward. And finally, it is ‑‑ I've lost my train of thought, I'm afraid. I appreciate your time, and if you have any further questions, I'd be happy to answer. Okay. Thank both counsel for your argument in this very interesting case. The case is Cetacean Community v. Bush is now submitted for decision. That concludes our oral argument calendar for this morning, and we stand adjourned until tomorrow morning at 8.30. Thank you very much.
judges: Hug, Alarcon, W. Fletcher